IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| PACIFICORP HOLDINGS, INC. PACIFICORP and SUBSIDIARIES,  Plaintiffs, | CV. 05-591-PK  FINDINGS AND RECOMMENDATION |
| v. | |
| UNITED STATES OF AMERICA, Defendant. | |

PAPAK, Magistrate Judge:

      Plaintiffs Pacificorp Holdings, Inc., Pacificorp, and its subsidieries (together "Pacificorp") filed this action seeking a refund of over 28 million dollars paid in additional tax assessments for tax years 1994-98 based on a 2002 audit. The parties agree that this case centers on a single question: whether a note on a $225 million loan ("Spring Creek Note") was a contingent debt instrument for federal income tax purposes. Under the relevant regulations, the

Spring Creek Note meets that definition if it provided for one or more contingent payments.[1] In determining whether a payment was contingent, the regulations required that "remote and incidental" contingencies be disregarded.

The parties agree that payments on the Spring Creek Note were contingent, but disagree on the riskiness of that contingency. The United State has conceded that the contingency was not incidental. The only issue, therefore, is whether any contingency affecting the Spring Creek Note was remote. If, as Pacificorp contends, the contingency affecting the Spring Creek Note was more than remote, then Pacificorp should have been allowed to calculate the accrued interest, for tax reporting purposes, using the applicable federal rate, and Pacificorp is entitled to a refund. If, as the United States argues, the contingency affecting the Spring Creek Note was remote, then the accrued interest should have been calculated, for tax reporting purposes, by applying the thirteen percent interest rate stated on the face of the Spring Creek Note and the IRS was correct in assessing Pacificorp the additional tax.

Before the court is the United States' Motion for Summary Judgment (No. 35). The United States contends that there is no genuine issue of material fact and that, as a matter of law, the contingency that affected the Spring Creek Note was remote. For the reasons set forth below, the United States' Motion for Summary Judgment should be denied.

## LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

---

[1] The proposed regulations that govern this case, Prop. Treas. Reg. § 1.1275-4, are no longer in effect. They were superseded by final regulations with somewhat different provision effective August 14, 1996.

Page 2 - FINDINGS AND RECOMMENDATION

genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56©). Summary judgment is not proper if material factual issues exist for trial. *See*, *e.g.*, *Celotex Corp. v. Catrett*, 477 U.S. 318, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995). In evaluating a motion for summary judgment, the district courts of the United States must draw all reasonable inferences in favor of the nonmoving party, and may neither make credibility determinations nor perform any weighing of the evidence. *See*, *e.g.*, *Lytle v. Household Mfg., Inc.*, 494 U.S. 545, 554-55 (1990); *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson*, 477 U.S. at 255.

## FACTUAL BACKGROUND

In 1983, Pacificorp owned approximately 82% of the outstanding common stock of NERCO, Inc, an Oregon corporation engaged in the production, exploration, and development of coal, natural gas, and crude oil. In the late 1970's, NERCO formed a wholly-owned subsidiary, Spring Creek Coal Company ("SCCC"), to own, develop, and operate certain coal mines located near Decker, Montana.

In 1978, SCCC entered into a long-term coal supply agreement with Utility Fuels, Inc. ("UFI") to supply UFI with coal from SCCC's mine between July 1, 1980, and June 30, 2005, for the purpose of generating power at the W.A. Parish Plant of Houston Lighting and Power ("HL&P") (the contract is hereinafter referred to as the "Spring Creek/UFI contract").

Between July 1980 and May 6, 1982, the parties amended the Spring Creek/UFI contract three times. The first amendment, on July 1, 1980, deferred some of the deliveries of coal and made minor adjustment to the pricing formula. The second amendment, on November 30, 1981, further deferred a portion of the scheduled deliveries of coal. The third amendment, on May 6, 1982, reduced the annual quantity requirements, continued deferring additional deliveries, and extended mandatory minimum payments that had been imposed by the November 30, 1981 amendment.

On July 15, 1982, UFI and HL&P filed suit against SCCC and NERCO invoking the commercial impracticability clause of the Spring Creek/UFI contract due to problems they were having burning coal from the Spring Creek mines. UFI and HL&P claimed that the high sodium content of the Spring Creek coal was causing severe "slagging" and "fouling" of HL&P's burners. Following negotiations in 1982-1984, UFI and HL&P withdrew the complaint. The negotiation resulted in agreements in principle that allowed SCCC to utilize coal from sources other than the Spring Creek mines and mix its coal with coal from other mines to fulfil its obligations under the Spring Creek/UFI contract and to resolve UFI and HL&P's dissatisfaction with the quality of coal produced by SCCC.

In 1986, HL&P was involved in an administrative rate proceeding before the Texas Public Utility Commission ("TPUC") wherein a TPUC staff member recommended that the TPUC inquire into the prudence of the Spring Creek/UFI contract. Based on that administrative rate proceeding, the TPUC instituted a coal prudence case against HL&P regarding the Spring Creek/UFI contract and a long term coal supply contract between HL&P and Kerr-McGee Coal

Corporation ("Kerr-McGee") to review the prudence of the price HL&P was paying for coal and the corresponding cost to consumers.

On June 30, 1986, faced with the possibility that the TPUC would not allow HL&P to recover its coal costs from the Spring Creek/UFI contract in the rate proceeding, HL&P and UFI again filed suit against SCCC and NERCO ("1986 litigation"). HL&P and UFI requested, among other things, a declaratory judgment that the Spring Creek/UFI contract be suspended or modified should the TPUC determine that HL&P could not recover its costs under the Spring Creek/UFI contract from its ratepayers. During the pendency of the 1986 litigation, UFI placed a portion of its payments under the Spring Creek/UFI contract in escrow. As a result, SCCC received reduced cash flows under the Spring Creek/UFI contract for a period of approximately eighteen months. Before its release, the amount held in escrow totaled over $100 million.

On December 21, 1987, the parties entered into a settlement agreement for the 1982 and 1986 litigation, and amended the Spring Creek/UFI contract for the fourth time. The principle consequence of the fourth amendment was that SCCC would no longer supply coal from its own mines, but rather would purchase coal from two third party producers (Exxon and Kerr-McGee) and then re-sell that coal to UFI. The fourth amendment also reduced the price to be paid by HL&P for coal delivered after January 1, 1988, to nearly three times the market price for coal, and modified provisions for price escalation thereafter.

On May 17, 1988, the TPUC approved the fourth amendment to the Spring Creek/UFI contract and specifically found that "the provisions of the [Spring Creek/UFI contract] as amended and the provision of the supply contracts underlying the amended [Spring Creek/UFI contract] are reasonable in light of the existing [Spring Creek/UFI contract] and the coal market

Page 5 - FINDINGS AND RECOMMENDATION

conditions existing at the time the amendment was negotiated." The TPUC concluded that "all questions regarding the prudence of HL&P's obtaining coal under the long term contract with [SCCC] have been resolved" and that "it is prudent for HL&P to obtain coal under the amendments to the Spring Creek and Kerr-McGee contracts effective January 1, 1988."

Dexter Martin was the corporate secretary for NERCO from the late 1970's through June 1993. Martin also served as counsel to NERCO during that time and was involved in the drafting and negotiations leading up to the formation of the Spring Creek/UFI contract and the four amendments made thereto. Martin testified at deposition that he was not aware of any fatal flaws in the Spring Creek/UFI contract after the fourth amendment that could have allowed HL&P to renegotiate or cancel the contract, but acknowledged that NERCO had a general fear of the unknown in terms of what HL&P might do.

In the Summer of 1992, Kennecott Corporation ("Kennecott") began exploring coal produced in the Western United States as a strategic investment opportunity. As part of that exploration, Kennecott specifically targeted Powder River Basin coal properties owned by NERCO in the late fall of 1992. Philip Bernhisel, Senior Vice President of Finance and Law for Kennecott, and William Glasgow, President of NERCO, met in January 1993 to discuss a sale of all of NERCO's assets to Kennecott. In the process of evaluating those assets, Kennecott learned about the Spring Creek/UFI contract.[2] Kennecott and NERCO disagreed as to the value of the Spring Creek/UFI contract. Kennecott saw the Spring Creek/UFI contract as a risky asset; the

---

[2]Kennecott was not allowed to conduct any substantive due diligence until after the sale was announced on February 17, 1993. And Kennecott was not allowed to, and did not, speak with UFI or HL&P about the Spring Creek/UFI contract until after the close of the sale in June 1993. Kennecott also did not contact the TPUC to discuss the Spring Creek/UFI contract during the negotiations for the sale.

Page 6 - FINDINGS AND RECOMMENDATION

biggest risk being that the price paid by UFI and HL&P was above the current spot market price for coal and the contract might be voided under some legal doctrine or renegotiated under pressure put on the supplier by the utility. NERCO, however, represented the Spring Creek/UFI contract as very solid and of an extremely low-risk nature based on the TPUC determination that HL&P prudently entered into the Spring Creek/UFI contract, the prior litigation and renegotiation of the contract, and the parties' intent to have a contract that would remain in place over its term. Initially, Kennecott did not want the Spring Creek/UFI contract to be included in the NERCO sale. Chase Manhattan, Kennecott's advisor during the negotiations with Pacificorp, advised Kennecott not to include the Spring Creek/UFI Contract in the sale. When Kennecott decided that it would accept the Spring Creek/UFI contract as part of the NERCO sale if the contract could be appropriately priced, Chase Manhattan chose not to assist Kennecott in pricing the contract and ceased advising Kennecott on the sale.

As a result of Kennecott and Pacificorp's difference of opinion regarding the value of the Spring Creek/UFI contract, Kennecott applied a significantly higher discount rate to the projected profits under the Spring Creek/UFI contract than Pacificorp did.

In order to bridge the gap between the two valuations, Pacificorp proposed the concept of the note at issue in this case: a $255 million loan from Pacificorp to SCCC and an accompanying note ("Spring Creek Note") that would allow Pacificorp and Kennecott to share in the risk of the Spring Creek/UFI contract by limiting payments under the Spring Creek Note to a portion of the profits from the Spring Creek/UFI contract. Under the terms of the Spring Creek Note, SCCC was required to make semi-monthly payments to Pacificorp equal to 50 percent of SCCC's revenues under the Spring Creek/UFI contract, less SCCC's expenses under its coal supply

agreements with Exxon and Kerr-McGee and certain administrative expenses.  Each payment would be first applied to the payment of all accrued and unpaid interest and, if there was any amount left from each payment, that amount would be applied to the outstanding principal balance of the Spring Creek Note.   If any payment was not sufficient to pay the amount of outstanding accrued and unpaid interest, then the unpaid amount of any such interest was added to the principal amount of the Spring Creek Note.  Failure to pay the amount of accrued and unpaid interest due to insufficient profits from the Spring Creek/UFI contract was not an event of default under the Spring Creek Note.  The Spring Creek Note bore interest at an annual rate of 13 percent.  The note matured in 25 years and the principal was prepayable at any time in whole or in part without premium or penalty.  If the balance of the Spring Creek Note remained unpaid on the date of the note's maturity, SCCC was relieved of the obligation to pay any such remaining balance pursuant to the terms of the Spring Creek Note.

On February 2, 1993, Martin stated that "I believe that under Texas law, prudency of the contract at the time of renegotiation has been established and that, except for new evidence or a change in circumstances, reasonableness has been established. I am not aware of any new evidence or change in circumstances from that considered by the Commission in 1988."  On June 2, 1993, Pacificorp executed the Spring Creek Note and the sale of NERCO to Kennecott closed.[3]

Martin testified at deposition that the last time any of the long-term coal supply contracts that he was involved with on behalf of NERCO were amended was in the mid-1980s.

---

[3]In 1999, the Texas Legislature passed Senate Bill 7, amending the Public Utility Regulatory Act ("PURA") and deregulating the Texas electricity market.

Page 8 - FINDINGS AND RECOMMENDATION

During the tax years 1994-98, Pacificorp reported interest income from the Spring Creek Note on their federal income tax returns calculated at the applicable federal rate at that time instead of the 13 percent rate stated on the face of the Spring Creek Note.  In 2002, the Internal Revenue Service ("IRS") conducted an audit of Pacificorp's consolidated income tax returns for the tax years 1994-98.  The IRS disagreed with Pacificorp's treatment of interest income from the Spring Creek Note and determined that Pacificorp should have reported interest at the 13 percent rate.  Based on that audit, the IRS assessed an additional $28,250,926.00 in tax, plus interest, against Pacificorp.  On September 30, 2004, Pacificorp paid the IRS $28,250,926.00 in tax plus $22,016,393.11 in interest.

## ANALYSIS

A debt instrument is generally issued for an amount of money equal to the price at which the instrument will be redeemed.  This is the stated principal amount.  The return to the lender is normally in the form of periodic interest payments.  If, however, a debt instrument is issued at a price less than the stated principal amount, the difference represents original issue discount ("OID").  The Internal Revenue Code (the "Code")  defines OID as "the excess (if any) of the stated redemption price at maturity (as defined in paragraph (b) of this section) over the issue price (as defined in §§ 1.1273-2 (b) and 1.1274-2(b))."  Prop. Treas. Reg. § 1.1273-1(a)(1), 51 Fed. Reg. 12022, 12059) (1986).   For tax purposes, OID is treated as interest, earned by the lender and paid by the borrower.

In 1984, Congress enacted 26 U.S.C. § 1271-1275, which provided new rules for the treatment of OID debt instruments, and authorized the Secretary of the Treasury ("Secretary") to prescribe regulations appropriate to carry out the purpose of those new rules.  In 1986, the

Secretary issued proposed regulation § 1.1275-4, which provided for treatment of certain OID debt instruments with one or more contingent payments. Prop. Treas. Reg. § 1.1275-4, 51 Fed. Reg. 12022 (1986). Under that regulation, debt instruments subject to one or more contingent payments ("contingent debt instruments") calculated accrued interest using the applicable federal interest rate. Prop. Treas. Reg. § 1.1275-4, 51 Fed. Reg. 12022 (1986). Debt instruments that did not qualify as contingent debt instruments calculated accrued interest by applying the interest rate stated on the face of the debt instrument. *Id.* Under the proposed regulation, an OID instrument could be subject to a contingent payment and not meet the definition of contingent debt instrument if the contingency was remote or incidental. Prop. Treas. Reg. § 1.1275-4(b)(1), 51 Fed. Reg. 12022, 12087 (1986) ("In determining whether a payment called for under a debt instrument is a contingent payment, remote and incidental contingencies may be disregarded by the Commissioner.").

In 1994 and 1996, the Secretary issued final regulations governing the treatment of OID contingent debt instruments. 59 Fed. Reg. 4799 (Feb. 2, 1994) and 61 Fed. Reg. 30133 (June 14, 1996). The preamble to the 1996 regulation provided guidance for treatment of OID contingent debt instruments issued before the effective date of the final regulation:

> For a contingent payment debt instrument issued before August 13, 2006, a taxpayer may use any reasonable method to account for the debt instrument, including a method that would have been required under the proposed regulations when the debt instrument was issued.

61 Fed. Reg. 30133, 30138 (June 14, 1006). The final regulations also provided the following guidance regarding the remote contingency concept:

Page 10 - FINDINGS AND RECOMMENDATION

> Remote contingencies. A contingency is remote if there is a remote likelihood either that the contingency will occur or that the contingency will not occur. If there is a remote likelihood that the contingency will occur, it is assumed that the contingency will not occur. If there is a remote likelihood that the contingency will not occur, it is assumed that the contingency will occur.

Treas. Reg. § 1.1275-2(h)(1) (as amended in 2004), 61 Fed. Reg. 30133 (June 14, 1996).

As noted above, the United States concedes that the contingencies were not incidental, but argues that the contingency at issue in this case, whether the payments made on the Spring Creek Note, which are based on the profits from the Spring Creek/UFI contract, would be sufficient to repay the Spring Creek Note, was remote and, therefore, does not qualify the Spring Creek Note as a contingent debt instrument.

The term "remote," as used in Prop. Treas. Reg. § 1.1275-4(b)(1), is not defined in either the Internal Revenue Code ("Code") or the regulations. Nor has it been interpreted by any court of law. As noted above, when Treasury finalized regulations under Code § 1275, the only guidance it chose to provide relating to the term "remote" was that "a contingency is remote is there is a remote likelihood either that the contingency will occur or that the contingency will not occur." Treas. Reg. § 1.1275-2(h)(2).

When the text of a statute or regulation contain an undefined term, the court must construe that term in accordance with "its ordinary or natural meaning". *FDIC v. Meyer*, 510 US 471, 476 (1994). *Accord United States v. Rowland*, 464 F.3d 899, 904-05 (9th Cir. 2006). Black's Law Dictionary defines the term "remote" as "slight." (8th ed. 2004). Merriam-Webster's Dictionary of Law defines "remote" as "small in degree." (1996). Both parties urge the court to adopt a "plain meaning" definition of remote. I agree and hereafter construe "remote" to mean

Page 11 - FINDINGS AND RECOMMENDATION

slight or small in degree.[4]

The United States maintains that whether a contingency is remote "is determined as of the issue date of the debt instrument," Treas. Reg. § 1.1275-2(h)(1) (as amended in 2004), in this case, the issue date of the Spring Creek Note. Pacificorp contends that the Treasury Regulation cited by the United States is a later version, and is not applicable to this case, but does not object to applying that regulation for purposes of this summary judgment motion.

While the parties agree to a plain meaning definition of remote and the point in time for determining if a contingency is remote, they disagree on what facts should be examined to determine whether a contingency meets the definition of remote. Specifically, they disagree on three points: (1) whether the court should consider only objective facts or also take into account subjective opinions and beliefs of the witnesses; (2) whether the court may take into consideration future expectations as of 1993 or look solely to historical facts date and market conditions as they existed in 1993; and (3) to what extent the court make take into consideration subsequent events.

"Save in those instances where the statute itself turns on intent, a matter so real as taxation must depend on objective realities, not on the varying subjective beliefs of individual taxpayers." *Lynch v. C.I.R.*, 273 F.2d 867, 872 (2d Cir. 1959), cited in *MacRae v. Commissioner*, 294 F.2d 56, 59 (9th Cir. 1961). In determining whether the alleged contingency is remote, the court will consider witnesses' opinions to the extent that they are necessary to explain actual

---

[4] In some instances, "remote" is defined in quantitative terms as five percent or less. *See e.g.* Code § 318(a)(3)(B)(i) (constructive ownership of stock) and Treas. Reg. § 26.2612-1(b)(1)(iii) (generation skipping transfers). Where, as here, the statute does not quantitatively define "remote," the court will construe the term "remote" according to its ordinary and natural meaning.

Page 12 - FINDINGS AND RECOMMENDATION

facts and historical events and are objectively supported or grounded in undisputed objective fact. The court will not take into consideration whether any of the parties or witnesses subjectively believed that the Spring Creek/UFI contract would not support payment on the Spring Creek Note.

Pacificorp urges the court to take into consideration the parties' expectations in 1993 for future years. The United States contends, however, that risk analysis is derived from historical events (recent and non-recent) based in reality and urges the court to look to historical facts leading up to the execution of the Spring Creek Note. Historical events are only one part of the equation. In deciding whether to enter into the Spring Creek Note, the parties had to consider likely future events. Those future expectations must be considered in determining whether a contingency was remote. Purely subjective speculation, however, will not be considered. The parties' claimed future expectations must have some reasonable grounding in the actual events and conditions that existed at the issue date of the Spring Creek Note.

Finally, the parties disagree over the extent to which the court may consider events subsequent to the Spring Creek Note issue date. In property valuation cases, where property is valued as of the valuation date on the basis of market conditions and without regard to hindsight, courts have allowed consideration of subsequent events "for the limited purpose of establishing what the willing buyer and seller's expectations were on the valuation date and whether these expectations were reasonable and intelligent." *Estate of Gilford v. Commissioner*, 88 T.C. 38, 52 (1987) (citations omitted). Subsequent events may only be considered, however, "to the extent that they were reasonably foreseeable at the date of valuation." *Id.* (citations omitted). In *Ithica Trust Co. v. United States*, 279 U.S. 151 (1929), Justice Holmes explained,

Page 13 - FINDINGS AND RECOMMENDATION

> [T]he value of the thing to be taxed must be estimated as of the time when the act is done. But the value of property at a given time depends upon the relative intensity of the social desire for it at that time, expressed in the money that it would bring in the market. Like all values, as the word is used by the law, it depends largely on more or less certain prophecies of the future, and the value is no less real at that time if later the prophecy turns out false than when it comes out true. Tempting as it is to correct uncertain probabilities by the now certain fact, we are of opinion that it cannot be done. . . .

*Id.* at 155. Borrowing from property valuation cases, in determining whether a contingency was remote the court will take into consideration events subsequent to the issue date of the Spring Creek Note only to the extent that they were (1) reasonably foreseeable as of the issue date and (2) establish that an expectation at the issue date was entertained and that the expectation was reasonable and intelligent.

The United States points to the following undisputed material facts and argues that the only reasonable inference to be drawn is that the contingency that the profits from the Spring Creek-UFI contract would be insufficient to repay the Spring Creek Note was remote:

1. The Spring Creek-UFI contract had been renegotiated and amended four times between 1984-87;

2. There were no renegotiations or amendments to the Spring Creek-UFI contract after 1987;

3. The base price for coal under the Spring Creek-UFI contract was nearly three times the market price of coal after the fourth amendment was enacted in 1987;

4. the TPUC found that the Spring Creek-UFI contract was prudent even though the price under the Spring Creek-UFI contract was nearly three times above the spot market for coal at that time;

Page 14 - FINDINGS AND RECOMMENDATION

5.      Richard O'Brien, who was NERCO's Senior Vice-President and CFO at or around the time the NERCO sale closed, stated at that time that the above-market price of coal in the Spring Creek-UFI contract as of the date of the TPUC's prudency determination is "not materially different from today's [i.e., June 1993] price. Moreover, it's difficult to imagine spot prices dropping from today's price given current variable cost structure on the PRB. Consequently, the spread between spot and contract prices should remain relatively constant or reduce if the spot prices increase";

6.      There was no intervention by the TPUC regarding the Spring Creek-UFI contract from the time of the prudency determination until the issue date of the Spring Creek Note;

7.      there were no changed circumstances which would allow the TPUC to overcome the res judicata effect of its 1988 prudency determination of the Spring Creek-UFI contract and institute any additional proceedings regarding the Spring Creek-UFI contract from the time of the prudency determination until the issue date of the Spring Creek Note; and

8.      The Texas Legislature did not pass Senate Bill 7, amending the PURA and deregulating the Texas electricity market, until six years after the date of the Spring Creek Note.

The United States basically argues that there was a flurry of activity, amendments, litigation and administrative action by the TPUC from 1984 until 1987. From 1987 until the Spring Creek Note was signed, however, there was no amendments, no litigation, no disputes, and no administrative

Page 15 - FINDINGS AND RECOMMENDATION

proceedings. Further, there were no changed circumstances that would cause any further amendments, litigation or administrative proceedings. The only reasonable inference, the United States argues, is that the Spring Creek /UFI contract was stable and the contingency that the profits from the Spring Creek-UFI contract would be insufficient to repay the Spring Creek Note was remote.

Even if the material facts at issue in this case are limited to those highlighted by the United States, if a jury could reach different inferences from those facts summary judgment is not appropriate. In evaluating this motion for summary judgment, the court must draw all reasonable inferences in favor of Pacificorp, the nonmoving party. Pacificorp argues, and the court agrees, the facts indicated by the United States give rise to more than one reasonable inference.[5] In fact, a reasonable inference to be drawn from the facts set forth above is that renegotiation, relitigation, and administrative action were all more than remote possibilities in 1993 when the Spring Creek Note was issued. For example, the fact that the Spring Creek-UFI contract had been renegotiated and amended four times between 1984-97 gives rise to a reasonable inference that the parties were amenable to revisiting the contract and amending it yet again. Because the material undisputed facts are subject to more than one reasonable inference, the United States' Motion for Summary Judgment should be denied.

---

[5]Pacificorp also argues that there are additional material undisputed facts that support its argument regarding remoteness, including that the Spring Creek Note was negotiated to share risk and that Chase Manhattan Bank withdrew as advisor to Kennecott on the NERCO sale. However, because the court finds that summary judgment is inappropriate based on the undisputed facts offered by the United States, the court need not address Pacificorp's additional facts. Additionally, while both parties submitted expert testimony in support of their respective positions, I find that resort to expert opinion is not necessary at this stage of the proceedings. Accordingly, I make no analysis or recommendation regarding the reliability or admissibility of testimony offered by either expert.

Page 16 - FINDINGS AND RECOMMENDATION

CONCLUSION

For the reasons set forth above, the United States' Motion for Summary Judgment (No. 35) should be denied.

SCHEDULING ORDER

The above Findings and Recommendation will be referred to a United States District Judge for review. Objections, if any, are due August 21, 2007. If no objections are filed, review of the Findings and Recommendation will go under advisement on that date. If objections are filed, a response to the objections is due fourteen days after the date the objections are filed and the review of the Findings and Recommendation will go under advisement on that date.

IT IS SO ORDERED.

Dated this 7th day of August, 2007.

      /s/ Paul Papak
Honorable Paul Papak
United States Magistrate Judge

Page 17 - FINDINGS AND RECOMMENDATION